1
2
3
4
5
6
7   IN THE UNITED STATES DISTRICT COURT
8   FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10
11
12   LEONARD FOX,                          No. C 05-2421 SBA

            Plaintiff.
13                                          **ORDER**
        v.
14                                          [Docket Nos. 24, 29]
     KAISER FOUNDATION EMPLOYEE
15   BENEFIT PLAN, et al.,

16          Defendants.
     _____
17

18          This matter comes before the Court on Defendants Kaiser Foundation Employee Benefit Plan

19   and Metropolitan Life Insurance Company's Motion for Summary Judgment and Plaintiff Leonard Fox's

20   Motion for Summary Judgment.  Having read and considered the arguments presented by the parties in

21   the papers submitted to the Court, the Court finds this matter appropriate for resolution without a

22   hearing.  The Court hereby GRANTS Defendants' Motion for Summary Judgment and DENIES

23   Plaintiff's Motion for Summary Judgment.

24                              **BACKGROUND**

25   **A.      Factual Background**

26          Plaintiff Leonard Fox ("Plaintiff") is a 41 year old man who worked as an Administrative

27   Specialist in the Hospice Program at Kaiser Medical Center ("Kaiser") from March 19, 2002 through

28   February 3, 2004.  Dyer Decl. at Ex. A (FOX225).  On July 1, 2002, Plaintiff became a beneficiary of,

*United States District Court*
*For the Northern District of California*

and participant in, defendant Kaiser Foundation Employee Benefit Plan (the "Plan"). Compl. at ¶ 2.

The Plan is covered by the Employment Retirement Income Security Act of 1974 ("ERISA"). *Id.*

**1.    Terms of the Plan**

Under the Plan, a participant may be entitled to receive long-term disability ("LTD") benefits if that individual becomes disabled as defined by the Plan. A participant is considered totally disabled under the Plan if:

> During your Elimination Period . . . and the next 24 month period, you are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy, or;
>
> After the first 24 months, you are unable to earn more than 80% of your indexed pre-disability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified taking into account your education, training, experience, and pre-disability Earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury . . .

Dyer Decl. at Ex. B (FOX338). The Plan also provides that, if the participant's disability qualifies as a psychiatric disability, his or her LTD benefits "continue for only two (2) years from the date of [his or her] LTD approval." *Id.* at Ex. B. (FOX339).

The Plan document entitled "Kaiser Permanente Welfare Benefit Plan" identifies the Plan fiduciaries as follows:

> 4.1 <u>Named Fiduciaries</u>. The named fiduciaries with respect to each Plan, for purposes of ERISA, shall be the Employers whose employees participate in such Plan. With respect to each Program in which benefits are provided under a Contract in which the Insurer is responsible for review of benefit claim determination, such Insurer is the named fiduciary with respect to such determinations, pursuant to ERISA Regulation § 2560.503-1(g)(2).
>
> 4.2 <u>Allocation and Delegation of Fiduciary Responsibility</u>.
>> a.    Each named fiduciary is allocated fiduciary responsibility with respect to the specific discretionary authority exercised by it, under the Contract(s) relating to the Program(s) in which such Named Fiduciary participates.
>
> 4.3 <u>Discretionary Authority of Fiduciaries.</u> Each named Fiduciary . . . shall have full and complete authority with respect to its responsibilities under the Plan and any Program hereunder. All actions, interpretations, and decisions of a Named Fiduciary . . . shall be conclusive and binding on all persons and shall be given the maximum possible deference allowed by law.

*Id.* at Ex. C (FOX237).

2

United States District Court

For the Northern District of California

The Programs covered by the Kaiser Permanente Welfare Benefit Plan document are defined as those set forth in Appendix A to the Kaiser document. *Id.* at Ex. C (FOX242). Appendix A identifies "Metropolitan Life Insurance Company Contract 95910, 95911," which is a group policy of insurance issued by defendant Metropolitan Life Insurance Company ("MetLife") to Kaiser, as a benefit plan covered by this document. *Id.* The Certificate of Insurance issued under the group contract specifically sets forth the Group Policy under which the Certificate issued as "Group Policy No. 95910-G." *Id.*

The Plan document entitled "Your Employee Benefit Plan, Kaiser Foundation Health Plan, Inc., Long Term Disability Benefits," provides as follows:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretations or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

*Id.* at Ex. D (FOX036).

The same Plan document provides that: (1) when an LTD claim is submitted, the claimant's employer will forward the claim form to MetLife; (2) if there is any question about a claim payment, an explanation may be requested from MetLife though the claimant's employer or by direct contact with the claimant's MetLife Group Disability claim office; and (3) when a claimant appeals a denial of a claim, MetLife will re-evaluate the claim decision and decide the appeal. *Id.*

**2.    History of Plaintiff's Claim for Long-Term Disability Benefits**

On or about September 13, 2002, Plaintiff was diagnosed by Dr. Chris Johnson, M.D. as HIV positive. Dyer Decl. at Ex. A (FOX210).

On or about January 27, 2004, Plaintiff began treatment for depression with Dr. Peter Cohen, M.D., the Chief of the Department of Psychiatry at Kaiser. *Id.* at Ex. A (FOX214, FOX217). Dr. Cohen noted that Plaintiff had been referred to him by Nurse Practitioner Kathy Weston[1] due to "depression x 6 mos in context of romantic break-up, suicide of best friend, HIV+ status." Dyer Decl.

---

[1]In her "Behavioral Medicine Intake" form, Nurse Weston noted that Plaintiff had told her that he "lov[ed] [his] job," but was feeling depressed and could not sleep due to his diagnosis of being HIV positive and the suicide of his friend. *Id.* at Ex. A (FOX125). Nurse Weston diagnosed Plaintiff with Major Depression, Bereavement, and HIV status. *Id.*

3

United States District Court

For the Northern District of California

1   at Ex. A ((FOX121-123).  In his evaluation, Dr. Cohen further noted that Plaintiff had informed him,

2   "I feel my whole world has been pulled out from me."  *Id.* at Ex. A (FOX122).  Additionally, Dr. Cohen

3   noted the presence of the following symptoms of depression: depressed mood, excessive

4   guilt/sinfulness/worthlessness, hopelessness, anhedonia, increased irritability, crying jags, change in

5   appetite, change in sleep, decreased energy, decreased motivation, somatic symptoms, decreased

6   socialization, and generalized anxiety.  *Id.*

7        On February 3, 2004, Plaintiff was examined by a psychiatrist at Kaiser, who found him to be

8   "clinically depressed."  Dyer Decl. at Ex. A (FOX052).  Plaintiff told the psychiatrist that he was

9   feeling stressed and depressed, that his boss was disorganized, that he was forgetting things, and that

10   he was unable to work.  *Id.*  The "causes" of Plaintiff's depression were listed as: (1) Plaintiff's new

11   diagnosis of being HIV positive, (2) his relationship ending, (3) the pressures of his job, and (4) his

12   friend's recent suicide.  *Id.*

13        On February 4, 2004, Plaintiff ceased working for Kaiser due to disability.  Dyer Decl. at Ex.

14   A (FOX217; FOX225).  Plaintiff was on leave pursuant to the Family Medical Leave Act ("FMLA")

15   until March 19, 2004.[2]  Dyer Decl. at Ex. A (FOX155-156).  When Plaintiff returned to work on or

16   about March 19, 2004, he received a negative performance evaluation and was denied a raise and bonus.

17   *Id.*  Plaintiff suspects that he received the negative performance evaluation out of retaliation for taking

18   leave and was being discriminated against due to his medical condition.  *Id.*  Plaintiff did not return to

19   work after receiving his performance review.

20        On or about May 18, 2004, Dr. Cohen  diagnosed Plaintiff with "Major Depression."  *Id.* at Ex.

21   A (FOX218).

22        On June 22, 2004, Plaintiff was seen by Nurse Weston at Kaiser who noted that Plaintiff felt that

23   his HIV status and depression was "all too much."  Dyer Decl. at Ex. A (FOX0104).

24        On or about June 25, 2004, Plaintiff began treatment for depression with Dr. Jonas Stern, Ph.D.,

25   a clinical psychologist at Kaiser.  *Id.* at Ex. A (FOX210).  Dr. Stern also diagnosed Plaintiff with a

---

26
27      [2]There are conflicting reports in the record as to whether the date Plaintiff returned to work was March 19, 2004 or April 19, 2004.  *Compare* Dyer Decl. at Ex. A (FOX112) *with* Dyer Decl. at Ex. A

28   (FOX155-156).  The Court need not resolve this factual discrepancy, as it does not materially impact the legal issues to be decided.

4

primary diagnosis of "Major Depression" and a secondary diagnosis of "Occupational Problem." *Id.* at Ex. A (FOX194).  In his "First Report of Occupational Injury or Illness," Dr. Stern noted subjective complaints of "depression triggered by workplace incident . . . patient . . . . suffered a relapse of his depression upon his return." *Id.* at Ex. A (FOX194).  Dr. Stern further noted objective findings of "depressed mood; excessive worry; anhedonia; anxiety; crying; poor appetite; poor concentration; difficulty sleeping; difficulty getting out of bed; no energy." *Id.*  The treatment plan was "individual therapy, medications as per MD.  Follow up appointment on 7/2/04.  Off 6/25/04 RTW: 7/6/04."

On or about July 13, 2004, Plaintiff submitted a claim to Metlife for LTD benefits based on a work-related condition of "depression, . . . impaired concentration and motivation." *Id.*

Also on or about July 13, 2004, Plaintiff was treated by Dr. Stern, who noted in his Physician's Progress Report that "Patient seen today reportting [*sic*] no changes in symptomatology; still feeling depressed; lacks concentration, and has problems falling and staying asleep.  He states that he doesn't feel that he 'can work under his supervisor, given what she has done.'" Dyer Decl. at Ex. A (FOX196-197).  The objective findings were "sad affect, depressed mood, nervous, fidgety." *Id.*  The primary diagnosis was "Major Depressive Disorder, Recurrent" with a secondary diagnosis of "Occupational Problem." *Id.*  The treatment plan was "Continued to treat as appropriate.  Off: 7/2/04 RTW: 8/2/04.  Follow up appointment on 7/12/04." *Id.*

On July 16, 2004, Dr. Stern noted in his Physician's Progress Report that "Patient reports sleeping only 4-5 hours/noc.; irritability; lack of patience; frustration; decreased concentration, and prefers to stay socially isolative." Dyer Decl. at Ex. A (FOX198-199).  The objective findings were "sad mood, worried affect, fidgety, taking Prozac 40MG QAM and Trazadone 50MG QHS." *Id.*  The diagnosis remained: "Major Depressive Disorder, Recurrent" with a secondary diagnosis of "Occupational Problem." *Id.*  The treatment plan was "start support group in 2 weeks.  Patient can return to full duties w/no restrictions on 8/16/04 (at transitional work site)." *Id.*

On July 20, 2004, MetLife contacted Plaintiff and advised him to complete and submit the following forms by August 18, 2004: (1) Attending Physician Statement; (2) Employee Statement; (3) Supervisory Statement (job description); and (4) State Disability or Worker's Compensation Benefit Documentation.  Dyer Decl. at Ex. A (FOX223).  MetLife also advised Plaintiff to submit certain

United States District Court

For the Northern District of California

physician, medication, and insurance information from his treating physicians from the last date of work to the present date. *Id.*

On July 23, 2004, Plaintiff was seen by Dr. Stern, who noted in his Physician's Progress Report that "Patient reports little change in symptoms . . . still having problems sleeping; more down that anything; fatigued; depressed; no energy; no incentive; trying to keep occupied and stay around people." Dyer Decl. at Ex. A (FOX 200-201).  Dr. Stern further noted objective findings of "psychomotor retardation; down cast; with sad affect; avoidant; with depressed mood." *Id.* The primary diagnosis was listed as: "Major Depressive Disorder, Recurrent" with a secondary diagnosis of "Relational Problems, Nos. Occupational Problems." *Id.*  The treatment plan was "Patient can participate in a modified work program starting 8/26/04 (estimated) until 12/26/04 = transitional work assignment in alternate department, follow up appointment on 7/28/04." *Id.*

On July 29, 2004, Dr. Stern advised that Plaintiff was completely unable to work from July 29, 2004 through August 5, 2004.  Dyer Decl. at Ex. A (FOX179).

On August 3, 2004, Dr. Stern noted in his Physician's Progress Report that:

> Patient reports no changes - no improvements in his symptomatology – low energy lev[el]; low moods; periods of anxiety and insomnia.  He states that he will be seeing his psychiatrist on 8/5/04, and will discuss possibly changing his anti depressant to one that could beter [*sic*] benefit his mental state.

Dyer Decl. at Ex. A (FOX177, FOX201-202).  Dr. Stern against listed the primary diagnosis as "Major Depressive Disorder, Recurrent," with a secondary diagnosis of "Occupational Problem." *Id.* He further noted objective findings of "sad affect, worried, anxious, depressed." *Id.*  Dr. Stern also advised that Plaintiff could participate in a "modified work program - alternate work location starting 9/6/04 (tentatively) until 12/6/04." *Id.*

On August 15, 2004, Plaintiff was seen by a physician at Kaiser, who noted that Plaintiff was complaining of panic attacks.  Dyer Decl. at Ex. A (FOX103).

On August 18, 2004, MetLife sent a letter to Kaiser requesting a copy of all of Plaintiff's therapy notes from January 1, 2004 to the present date, a history of Plaintiff's medications, a copy of all available psychological testing; and a disability statement completed by either Nurse Weston or Dr. Cohen.  Dyer Decl. at Ex. A (FOX190).  Also on August 18, 2004, MetLife sent a letter to Dr. Stern requesting Dr.

United States District Court
For the Northern District of California

6

United States District Court

For the Northern District of California

Stern to submit certain additional information concerning Plaintiff's continuing eligibility for benefits by September 8, 2004. *Id.* Specifically, Dr. Stern was asked to advise MetLife of: (1) Plaintiff's diagnosis and the functional limitations that limited Plaintiff from returning to work; (2) Dr. Stern's objective medical findings; (3) the results of any psychological testing, if any had been performed; (4) the current treatment regimen and goals; (5) the dates Plaintiff was first and last seen; (6) the frequency of the treatments; (7) Plaintiff's medications and dosages; (8) the psychosocial stressors that could impact Plaintiff's efforts to return to work or recovery; (9) the aspects of Plaintiff's job that Plaintiff was not able to perform; (10) what Plaintiff needed to do in order to be able to return to work; (11) the types of reasonable accommodations that would facilitate re-entry into the work place; and (12) whether Plaintiff could perform the same job in another location or with another company. *Id.*

Also on August 18, 2004, MetLife sent Plaintiff a letter asking Plaintiff to complete and return by September 18, 2004: (1) an "Activities of Daily Living" form; and (2) a "Training, Education, and Experience" form. Dyer Decl. at Ex. A (FOX187).

On August 12, 2004, Dr. Stern completed a "Patient Progress Record" form, indicating that Plaintiff was having panic attacks, was still feeling depressed, was having difficulty falling asleep, and had a low energy level. Dyer Decl. at Ex. A (FOX183). The objective symptoms noted by Dr. Stern included a sad effect, low motivation, low energy, apprehension, and depressed mood. *Id.* Dr. Stern diagnosed Plaintiff has having "Major Depressive Disorder, Recurrent, Panic Disorder w/o Agoraphobia, and Occupational Problem." *Id.* He further noted that Plaintiff was not making adequate progress. *Id.* Dr. Stern advised that Plaintiff could "temporarily perform usual and customary work in alternate department" from September 6, 2004 to December 6, 2004. *Id.*

On August 19, 2004, Dr. Stern completed a "Patient Progress Record" form, indicating that Plaintiff had reported "having negative interaction with a claims investigator on the telephone the day before, and having four panic attacks over the past week; not yet deriving benefits from new medication (Effexor), but is having anticholinergic side-effects. He attributed having benefited [*sic*] from attending a support group." Dyer Decl. at Ex. A (FOX186). Dr. Stern also reported the following objective symptoms: "feeling tense, worried, apprehensive, frustrated, and with depressed affect." *Id.* Additionally, Dr. Stern noted that Plaintiff would be completely unable to work from August 19, 2004

1   to September 18, 2004 but could tentatively return to work in a different department from September
2   19, 2004 to December 19, 2004.

3          On or about September 2, 2004, Dr. Stern replied to MetLife's August 18, 2004 letter by
4   providing the requisite information, including: (1) a First Report of Occupational Injury or Illness; (2)
5   a Psychological Diagnostic Intake Evaluation form; and (3) numerous "Industrial Work Status" forms
6   and Primary Treating Physician's Progress Reports for the period of June 25, 2004 through August 19,
7   2004.  *See* Dyer Decl. at Ex. A (FOX153-186).

8          On or about September 9, 2004, Plaintiff submitted a completed "Activities of Daily Living"
9   form to MetLife.  *Id.* at Ex. A (FOX136).  In the form, Plaintiff described his condition as "HIV+, severe
10  chronic diarrhea and depression, unable to multi-task, diminished concentration[,] inability to motivate
11  self towards activities of daily living[,] leg cramps due to possible neuropathy[,] inability to sleep, T-
12  cells 340 viral load up to 50,000[,] fatigue, weakness."  *Id.*  Plaintiff further noted that his was taking
13  Effexor, Diphenoxylate, Pepcid, Trazodone, Temzepam, Prozac, Zerit, and "other HIV meds."  *Id.*
14  Additionally, Plaintiff stated that he was unable to get out of bed due to depression approximately four
15  out of seven days of the week.  *Id.*  Plaintiff also submitted a completed "Training, Education, and
16  Experience" form.  *Id.* at Ex. A (FOX134).

17         Subsequently, MetLife requested and reviewed the following documentation submitted in
18  support of Plaintiff's claim for LTD benefits, including, but not limited to: (1) a statement and progress
19  reports submitted by Dr. Jonas Stern; (2) Plaintiff's employee statement; (3) Plaintiff's employer's
20  statement; and (4) Plaintiff's supervisor's statement and job description.  Dyer Decl. at Ex. A (FOX192-
21  205, FOX217, FOX225-226).

22         On or about October 2, 2004, MetLife determined that Plaintiff's LTD claim would be denied.
23  Dyer Decl. at Ex. A (FOX132).

24         On October 7, 2004, MetLife informed Kaiser via a letter that it had completed its evaluation
25  of Plaintiff's claim for LTD benefits and had determined that the information submitted did not support
26  a finding that Plaintiff had an impairment "severe enough to prevent him from performing the duties of
27  his occupation for any employer."  *Id.* at Ex. A (FOX130).  Accordingly, MetLife stated that Plaintiff's
28  claim had been denied.  *Id.*  Also on October 7, 2004, MetLife informed Plaintiff via a letter that his

claim had been denied. *Id.* at Ex. A (FOX128). Plaintiff was advised of the following:

> We wrote to Kaiser Permanente, Department of Psychiatry, Oakland, on August 18, 2004 for your therapy notes from January 1, 2004, all psychological test results, and the completion of a disability questionnaire by either Kathy Weston or Dr. Peter Cohen. We have not received a response to this request. We have received a copy of Dr. Cohen's statement of May 18, 2004, which states that during your depressive episode you suffered from impaired concentration and motivation, but this statement does not verify that you are unable to work. It only states that this is quite common during a bout of depression and often interferes with work performance.
>
> The medical information we received from Dr. Jonas Stern states that he first saw you on June 25, 2004. Dr. Stern's initial report notes that you had subjective complaints of depression triggered by a workplace incident after you returned from FMLA leave from February 2, 2004 through March 19, 2004, when you received a negative performance evaluation and were denied a raise and bonus by your supervisor. Subsequent statements by Dr. Stern that estimate return to work dates stipulate that you can return to work at a transitional work site.
>
> Dr. Stern did not see you until June 25, 2004, and we have received no support from your medical records from Kaiser Permanente, or the providers that treated you there, of disability from work from February 4, 2004. Based on our review of the medical information provided at this time, we are unable to determined [*sic*] that the medical documentation supports restrictions and limitations of such severity that you would be prevented from performing the material duties of your occupation for any employer in your Local Economy. Therefore, your claim has been denied.

*Id.* at Ex. A (FOX127-128). MetLife informed Plaintiff of his right to appeal the decision within 180 days of receipt of the denial letter. *Id.*

On or about November 17, 2004, MetLife received additional medical information from the psychiatric department at Kaiser, including treatment and therapy progress notes from Nurse Weston and Dr. Cohen for the time period of January 26, 2004 through October 1, 2004. *See* Dyer Decl. at Ex. A (FOX043). Accordingly, on November 24, 2004, MetLife sent Plaintiff a letter informing him that it was extending its review of his claim for an additional forty-five days due to the fact that it had received the additional medical records. *Id.* at Ex. A (FOX095). Also on or about November 24, 2004, MetLife referred Plaintiff's claim to an "Independent Consultant Physician" ("ICP"), Dr. Lee H. Becker, M.D. *Id.* at Ex. A (FOX096).

On December 1, 2004, Dr. Becker completed his evaluation of Plaintiff's claim. *Id.* at Ex. A (FOX091). In conducting his evaluation, Dr. Becker reviewed the following documents: (1) the January 26, 2004 Behavioral Health Intake Assessment form completed by Nurse Weston; (2) the Mental Health

9

United States District Court

For the Northern District of California

1  Clinician progress notes from January 27, 2004 through October 1, 2004 from Nurse Weston and Dr.

2  Cohen; (3) the June 25, 2004 Psychological Diagnostic Intake Evaluation form completed by Dr. Stern;

3  (4) the follow-up progress notes from July 2, 2004 through August 23, 2004 from Dr. Stern; and (5) the

4  September 9, 2004 ADL Survey completed by Plaintiff.  *Id.*  Based on his review of the aforementioned

5  records, Dr. Becker concluded that:

6  
7  
8  
9  
10  
11

> The medical documentation available to review does not support continuous, global psychiatric impairments to preclude own occupational functioning in any department or for any employer from 2/03/04 forward.  The information reviewed shows various self reported depressive symptoms, however, the initial mental health documentation around the day last worked did not document specific and significant deficits in daily functioning due to the psychiatric condition and the mental status examinations do not indicate significant deficits.  The initial psychiatric evaluation did not indicate that the Claimant was significantly disabled.  The information reviewed showed work related issues, which appeared to be impacting motivation to return to work under the current supervisor at the current employer.

12  *Id.* at Ex. A (FOX094).

13  On December 10, 2004, MetLife sent Dr. Stern and Dr. Cohen letters stating that Dr. Becker had

14  reviewed Plaintiff's medical file and concluded that his review did not "support such significant, global

15  psychiatric impairment to preclude own occupational functioning in any department for any employer

16  from February 3, 2004 forward." *Id.* at Ex. A (FOX089-090).  MetLife advised Dr. Stern and Dr. Cohen

17  to respond in writing if they did not concur with Dr. Becker's analysis and conclusions.  *Id.*

18  On December 14, 2004, MetLife informed Kaiser and Plaintiff in writing that his claim had been

19  denied.  *Id.* at Ex. A (FOX072-076).  Specifically, MetLife told Plaintiff:

20  
21  
22

> On the employee application for benefits you stated that you were prevented from performing the duties of your job due to major depression, impaired concentration and motivation, and interference in work performance by the depression.

23  
24

> Dr. Becker reviewed the medical documentation and concluded that the information available to review does not support such significant, global psychiatric impairment to preclude own occupational functioning in any department or for any employer for February 3, 2004 forward.

25  
26  
27  
28

> The January 26, 2004 Mental Behavioral Diagnostic Evaluation by K. Weson stated that concentration was okay and there was not suicidal ideation.  You were not motivated and you were spending money and in debt.  You reported no energy.  The Mental Status Examination showed that appearance and behavior, cognition, insight, judgement, attention, impulse control, and thought process and thought content, were within normal limits.  Mood and affect were described as anxious, depressed and tearful.  The Diagnosis and Assessment

10

section indicated major depression and bereavement and a chronic medical condition.

The January 27, 2004 Medical Evaluation by Dr. Cohen showed complaints of depression, describes a relationship breakup and loss of a friend as well as medical issues. Various self reported depression symptoms are noted. The Targeted Symptoms section indicated no history of mania or hypomania and no history of psychosis. Generalized anxiety is noted. The Mental Status Examination showed that you were cooperative and not psychotic. Orientation and memory were within normal limits. Cognition was noted to be within normal limits and mood and affect were described as depressed. Psychomotor pace was described as retarded and Mental Status Examination showed that you were not gravely disabled. The Plan noted to start Prozac at 10 mg to increase to 20 mg an [*sic*] follow up in four weeks.

The February 3, 2004 psychotheraphy note indicated the [*sic*] you wanted time off work. You felt stressed, the "Boss disorganized," you felt unable to work, forgetting things, you felt depressed, sometimes you felt good and sometimes you felt "wiped." Stresors [*sic*] noted were medical issues, a relationship ending, and pressures of the job. The February 10, 2004 psychotherapy note indicated that you were feeling better, and noted that "a co-worker told him they were going to make it rough for me, so I quit." The note does not indicated [*sic*] any abnormalities in mental status examination and does not describe significant impairments in activities of daily living.
The Subjective section of the March 16, 2004 medication follow up note indicated that you felt a little better. Objectively the note indicated that you were starting to feel better, mood was improved, sleep was improved, and you were more animated and cheerful. The notes does not indicate significant deficits in daily functioning. The March 23, 2004 note indicated that "I feel okay." You were noted to be more cheerful with good eye contact and you were eating well. The April 15, 2004 note indicated that you went home and had a good trip. Some problems falling asleep were noted but there was no documentation of difficulties in daily functioning. The note indicates you were ready to go back to work. There was no mental status examination.

The May 4, 2004 Medication follow up note indicated that you returned to work, received a poor job evaluation, even though you were Employee of the Month in October, and did not get a raise and bonus. Prior evaluation showed fully effective. Now you were sleeping excessively. The note does not indicate any mental status impairments nor is there a full mental status examination done. The Plan noted to increase Prozac to 60 mg daily.

The June 25, 2004 Psychological Diagnostic Intake Evaluation – Industrial, by Dr. Jonas Stern was reviewed. The Subjective section of the Evaluation indicated a chief complaint of "depressed triggered by a workplace incident." The History of Present Illness section indicated that you reported suffering a relapse of depression upon returning from FMLA leave from February 2, 2004 to March 19, 2004 when you received a negative performance evaluation, and were denied a raise and bonus by your supervisor who, up until that time, had praised your work. You believed that the explanation could be attributed to retaliation for leaving, and discrimination for your medical condition. The Mental Status Examination showed appearance and behavior, speech, though processes, perception, impulse control, insight, and judgement were within normal limits. There was no documentation of cognitive deficits.

United States District Court

For the Northern District of California

1
2
3
4
5

Dr. Becker stated that the medical documentation available to review does not support continuous, global psychiatric impairments to preclude own occupation functioning in any department for any employer from February 3, 2004 forward.  The information reviewed shows various self reported depressive symptoms, however, the initial mental health documentation around the day last worked did not document specific and significant deficits in daily functioning due to psychiatric condition and the mental status examinations do not indicate significant deficits.  The initial psychiatric evaluation did not indicate that you were significantly disabled.

6    *Id.* at Ex. A (FOX073).  Plaintiff was advised of his right to appeal the decision.  *Id.*

7    On January 7, 2005, Dr. Cohen submitted a letter advising MetLife that he had reviewed Dr.

8    Becker's report and did not agree with Dr. Becker's conclusions regarding Plaintiff.  *Id.* at Ex. A

9    (FOX070).  Dr. Cohen noted that Plaintiff had "remained quite depressed" and that returning him to

10   "what he perceives to be a hostile work environment did not seem the best treatment plan."  *Id.*  Dr.

11   Cohen further stated that he stood by his previous assessment that Plaintiff's depression rendered him

12   unable to work.  *Id.*

13   On January 10, 2005, a representative of MetLife spoke with Dr. Stern via telephone.  *Id.* at Ex.

14   A (FOX047).  Dr. Stern advised that, when he last saw Plaintiff on August 2004, Plaintiff was precluded

15   from working due to his symptoms.  *Id.*  Dr. Stern noted that Plaintiff had memory loss and a low energy

16   level, and had poor concentration and insight.  *Id.*

17   On February 16, 2005, Plaintiff, through his attorney, appealed Metropolitan's denial of his

18   claim.  *Id.* at Ex. A (FOX067).  Subsequently, MetLife referred Plaintiff's file to another ICP, Dr.

19   Leonard Kessler, M.D., a Board Certified Psychiatrist.  *Id.* at Ex. A (FOX049, FOX055-57, FOX62).

20

21   On May 7, 2005, MetLife informed Plaintiff's attorney that Plaintiff's appeal had been denied.

22   Specifically, MetLife stated that Plaintiff's file had been reviewed by an independent consultant, and

23   that:

24
25
26
27
28

This physician found that the mental status examination by Dr. Cohen when he had first seen Mr. Fox on January 27, 2004, showed some depressive affect but no evidence of any impairments in memory, attention, concentration, or social interaction.  He states that Mr. Fox was then prescribed Prozac and Trazadone, with unclear response, and this later changed to Effexor in October 2004, also with unclear response.  His treatment notes by Ms. Westing [*sic*] and Dr. Cohen addressed his attempts at legal remedies for his work conflicts but did not provide any alternative means of conflict resolution or occupational direction.  The consultant found that all progress notes showed a preocupation with his

occupational conflicts but did not provide any specific functional limitations which were sustained from February 3, 2004. He noted that a recent letter by Dr. Cohen, dated January 4, 2004 (should be 2005?), indicated that "Mr. Fox has remained quite depressed, and returning him to what he perceives to be a hostile work environment did not seem the best treatment plan." [*sic*] but did not provide any rationale, in terms of objective mental status findings or resultant functional limitations, to support a period of disability. He did not address obstacles to treatment nor provide evidence that treatment was being provided as appropriate for conflict resolution. This physician also notes that a progress note by Dr. Stern on July 15, 2004 indicated an estimated return to full duty on August 16, 2004 "(at transitional work site)", with no subsequent rationale for continued absence from work. In addition, his phone message in response to Dr. Becker's report did not provide a rationale for Mr. Fox's self-reported symptoms.

In summary, the medical documentation does not show the presence of severe psychiatric symptoms or cognitive impairments preventing Mr. Fox from performing his Own Occupation for any employer in his local economy as of February 3, 2004. Therefore, we find our original decision is appropriate.

*Id.* at Ex. A (FOX061-062). MetLife also advised Plaintiff that he had exhausted his administrative remedies under the Plan and that no further appeals would be considered. *Id.* at Ex. A (FOX063).

**B.    Procedural History**

On June 15, 2005, Plaintiff filed a Complaint for ERISA Benefits against defendants the Plan and MetLife (collectively referred to herein as "Defendants"). In his Complaint, Plaintiff alleges that he has been damaged by the loss of benefits from February 3, 2004 to date in the sum equal to 60% of his salary less set-offs as permitted by the policy, and benefits continuing into the future until such time as he becomes able to work. *Id.* at ¶ 7.

On March 28, 2006, defendants the Plan and MetLife (collectively, "Defendants") filed the instant Motion for Summary Judgment. On April 4, 2006, Plaintiff filed a cross-Motion for Summary Judgment.

<u>**LEGAL STANDARD**</u>

**A.    Summary Judgment**

Under Federal Rule of Civil Procedure 56, a court may properly grant a motion for summary judgment if the pleadings and materials demonstrate that there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable

United States District Court

For the Northern District of California

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may be granted in favor of a defendant on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989). When the parties file cross-motions for summary judgment, the district court must consider all of the evidence submitted in support of both motions to evaluate whether a genuine issue of material fact exists precluding summary judgment for either party. *The Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001).

To withstand a motion for summary judgment, the non-movant must show that there are genuine factual issues which can only be resolved by the trier of fact. *Anderson*, 477 U.S. at 250. The nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

Additionally, the evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49 (2d Cir.1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

**B.    ERISA**

Pursuant to 29 U.S.C. § 1132(a)(1)(B), an individual may bring a civil action to recover benefits due him from an ERISA plan. ERISA does itself set forth the standard of review to be applied to an action brought under § 1132(a)(1)(B). *Firestone Tire and Rubber Co.*, 489 U.S. 101, 109 (1989). However, the Supreme Court has established the standard: "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. The default is that the administrator has no discretion, and the administrator has to

show that the plan gives it discretionary authority in order to get any judicial deference to its decision. *Kearney v. Standard Insurance Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999). When it is shown that the administrator has discretion, the court will apply an abuse of discretion standard of review. *Firestone Tire*, 489 U.S. at 115.

Under an abuse of discretion review, the dispositive issue is whether the denial of benefits was unreasonable. *See Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir. 1995). A plan administrator abuses its discretion if it provides no explanation for its decision, reaches a conclusion in conflict with the plan's plain language, or bases its decision on clearly erroneous findings of fact. *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1323-4 (9th Cir. 1995). A plan administrator also can abuse its discretion by denying a claim without obtaining relevant information. *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).

The abuse of discretion standard can be heightened by the presence of a conflict of interest. *Bendixen v. Standard Insurance*, 185 F.3d 939, 943 (9th Cir. 1999). Only a serious conflict heightens scrutiny, however. *Id.* at 943 (citation omitted). In order to establish a serious conflict, "the beneficiary has the burden to come forward with material, probative evidence beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligation to the beneficiary." *Id.* If the beneficiary satisfies this burden, then the plan bears the burden of showing that the conflict of interest did not affect the decision to deny benefits. *Id.* If the beneficiary does not satisfy the burden, then the tradition abuse of discretion standard applies. *Id.*

"When the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Id.* at 942.

## ANALYSIS

In his Motion for Summary Judgment, Plaintiff asks that the Court review MetLife's denial of his claim for LTD benefits *de novo*, find that Plaintiff has been disabled under the Plan from February 3, 2004 through February 3, 2006, remand the case to the Plan for calculation of benefits and prejudgment interest as well as a determination of disability beyond the two-year period, and award him

1  attorney's fees and costs.  In Defendants' Motion for Summary Judgment, Defendants request that the

2  Court review the denial of benefits under the abuse of discretion standard, find that MetLife's decision

3  was reasonable and supported by the administrative record, and deny Plaintiff's request for benefits,

4  prejudgment interest, and attorney's fees.

5  **A.    Standard of Review**

6         The first issue that the Court must determine is whether it should review MetLife's denial of

7  benefits *de novo* or under the abuse of discretion standard.  The Plan language is the starting point for

8  ascertaining the appropriate standard of review.  *Walker v. American Home Shield Long Term Disability*

9  *Plan*, 180 F.3d 1065, 1068 (9th Cir. 1999).  "[A] denial of benefits challenged under § 1132(a)(1)(B)

10 is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

11 discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

12 *Firestone*, 489 U.S. at 109.  The initial burden of establishing the appropriate standard falls on the

13 Defendants.  *See Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1089 (9th Cir. 1999) ("[T]he default is

14 that the administrator has no discretion, and the administrator has to show that the plan gives it

15 discretionary authority in order to get any judicial deference to its decision.").

16        Here, Plaintiff argues that the *de novo* standard applies because: (1) MetLife is not identified as

17 a Plan fiduciary in any of the Plan documents, and (2) the Summary Plan Description does not grant

18 MetLife with any discretionary authority.  Plaintiff is wrong on both the law and the facts.  First, as

19 Defendants point out, the umbrella Plan document entitled "Kaiser Permanente Welfare Benefit Plan"

20 unambiguously and expressly provides that MetLife is a named fiduciary because MetLife is the

21 "Insurer . . . responsible for review of benefit claim determination[.]"  *See* Dyer Decl. at Ex. C

22 (FOX237).  Second, the Plan document entitled "Your Employee Benefit Plan, Kaiser Foundation

23 Health Plan, Inc. Long Term Disability Benefits" also provides that MetLife is a Plan fiduciary because

24 it states that: (1) claim forms will be forwarded to MetLife; (2) any questions about claims are to be

25 directed to MetLife; and (3) MetLife re-evaluates claims on appeal and makes decisions on appeals.

26 Dyer Decl. at Ex. D (FOX036); *see also* 29 U.S.C. § 1002(21)(A) (providing that a person is a fiduciary

27 with respect to a plan to the extent that he has any discretionary authority or discretionary responsibility

28 in the administration of such plan).

United States District Court

For the Northern District of California

Further, both the Kaiser Permanente Welfare Plan and the document entitled "Your Employee Benefit Plan, Kaiser Foundation Health Plan, Inc. Long Term Disability Benefits" clearly confer discretionary authority upon MetLife. Specifically, the Kaiser Permanente Welfare Plan states that "[e]ach named Fiduciary . . . shall have full and complete authority with respect to its responsibilities under the Plan and any Program hereunder." *Id.* at Ex. C (FOX237). Additionally, the document entitled "Your Employee Benefit Plan, Kaiser Foundation Health Plan, Inc. Long Term Disability Benefits" states that the Plan fiduciaries "shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." *Id.* at Ex. D (FOX036). Moreover, contrary to Plaintiff's assertion, there is no requirement that the discretionary language be contained in the Summary Plan Description itself. *Cagle v. Bruner*, 112 F.3d 1510, 1517 (11th Cir. 1997) (holding that the court must look to all plan documents to determine whether the plan affords enough discretion and rejecting the argument that the conferral of discretion must be contained in the summary plan description).

Nevertheless, although Defendants have tentatively established that the abuse of discretion applies, and although Plaintiff does not argue this point in his opening Motion, Defendants concede in their Motion that the abuse of discretion standard of review can be heightened if a serious conflict of interest is established. *Jordan v. Northrup Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2004). However, to show that a "serious" conflict of interest exists, the beneficiary must do more than point to the fact that an insurance policy is both issued and administered by the same party, as it is here. *Id.* Rather, the beneficiary has the burden of coming forward with "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Id.* at 875-76. If the beneficiary satisfies this burden, then the Plan bears the burden of producing evidence to show that the conflict of interest did not affect the decision to deny benefits. *Friedrich*, 181 F.3d at 1109.

As set forth in *Siebert v. Standard Ins. Co. Group Long-Term Disability Policy*, 220 F.Supp.2d 1128, 1135 (C.D. 2002), there are a number of factors that a court may consider in determining whether a "serious" conflict of interest exists. These factors include: (1) evidence that the plan fiduciary rejected

the treating physician's opinions;[3] (2) evidence showing that inconsistent reasons were given for the denial of benefits; (3) evidence showing that the plan fiduciary changed its position despite the fact that no new evidence was received; (4) evidence showing that the plan fiduciary relied on an improper definition of disability under the plan; (5) evidence showing that the plan fiduciary determined a material fact without providing any supporting evidence; (6) evidence showing that the plan fiduciary failed to provide any reasons for the denial of benefits; (7) evidence showing that the plan fiduciary failed to provide sufficient notice of the denial of the claim; and (8) when the administrative record, taken as a whole, indicates that the plan fiduciary "acted as an adversary bent on denying the beneficiary's claim . . . oblivious to her fiduciary obligations as administrator of the LTD Plan."[4]  *Id.* (internal quotations omitted).

In the instant case, Plaintiff argues in his Reply brief that a serious conflict of interest exists because: (1) MetLife has used Dr. Kessler as an independent consultant on at least seven prior occasions; and (2) Dr. Kessler has consistently supported the denial of claims in each of those cases, demonstrating a purported bias towards the denial of benefits.[5]  Plaintiff also argues that MetLife relied

---

[3]This factor is referred to as the "treating physician rule." *Id.* at 1136.  Under the treating physician rule, a treating physician's opinion as to the nature and severity of the individuals' disability must be given controlling weight if that opinion is well-supported and not inconsistent with other substantial evidence in the case record. *Id.* (citing *Edlund v. Massanari,* 253 F.3d 1152, 1157 (9th Cir. 2001)).  "The rationale behind this rule is that the treating physician has more of an opportunity than an examining or reviewing physician to observe the claimant and familiarize himself with the claimant's condition." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).  Nevertheless, the rule does not require or obligate a plan fiduciary to accord special deference to the opinion of the treating physician, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003), and a treating physician's opinion may be disregarded by the plan fiduciary if the fiduciary produces specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Siebert*, 220 F. Supp. 2d at 135.

[4]With respect to this last factor, Plaintiff argues that MetLife is biased because MetLife has selectively referred to certain excerpts from the administrative record favorable to its case to support its summary judgment motion.  However, Plaintiff has not provided the Court with any authority for his assertion that mere attorney advocacy set forth during a summary judgment motion can be used to establish the fact that the party was biased during the underlying claims process.  Moreover, MetLife's attorneys' advocacy in the instant proceedings simply cannot be equated with a finding that MetLife acted as an "adversary bent on denying [Plaintiff's] claim" *during* the claims process; otherwise, this factor would be satisfied every time a fiduciary defends against an ERISA claim in court.

[5]Plaintiff also contends that Dr. Kessler's opinion was flawed because he failed to consider two documents that were purportedly submitted to MetLife but are not part of the administrative record.  However, Plaintiff has not produced any admissible evidence showing that these documents were, in

United States District Court

For the Northern District of California

1    on an improper definition of disability under the Plan.[6]

2           The Court finds Plaintiff's arguments regarding Dr. Kessler unpersuasive.  First, the fact that

3    Plaintiff has identified seven cases in which Dr. Kessler disagreed with the plaintiff's treating physician

4    is not necessarily conclusive of anything, because – as Defendants point out – a lawsuit based on the

5    denial of benefits would not be filed in the instances where Dr. Kessler rendered an opinion *agreeing*

6    with the treating physician and recommending the issuance of benefits.[7]  More importantly, Plaintiff has

7    failed to explain or even address the fact that Dr. Kessler's opinion is consistent with the opinion offered

8

9

10

11

---

12    fact, part of the administrative record; rather, he has submitted a declaration from his attorney – who
      does not appear to have been the attorney assisting Plaintiff with the claims process – that the documents
13    "were in the file which I received from prior counsel for Mr. Fox, and which should be part of the
      medical records produced by Kaiser Permanente to MetLife herein, but which, for unexplained reasons,
14    are absent from the administrative record."  Padway Decl. at ¶ 3, Exs. 2, 3.  Since Mr. Padway concedes
      that he has no personal knowledge of the facts to which he attests, his affidavit does not provide the
15    Court with sufficient basis to assume that the documents were part of the administrative record,
      particularly when Defendants dispute that the documents were produced to MetLife, and none of the
16    other evidence before the Court supports a finding that they were submitted.  Accordingly, the Court
      has not considered Exhibits 2 and 3 to the Padway Declaration.

17    [6]Plaintiff does not specifically rely on the fact that MetLife rejected the opinions of his treating
18    physicians to support his assertion that a serious conflict exists here.  Moreover, it is not clearly
      established that MetLife "rejected" Plaintiff's diagnosis of Major Depression or that MetLife's decision
19    is actually inconsistent with the opinions of Plaintiff's treating physicians.  For example, the
      administrative record indicates that MetLife considered the diagnoses of Dr. Cohen and Dr. Stern, but
20    noted that Dr. Stern had not indicated that Plaintiff was suffering from a disability of such severity that
      he could not perform the material duties of his occupation for *any* employer in his local economy, as
21    Dr. Stern had stated on several occasions that Plaintiff would be able to return to an alternative work
      site.  Dyer Decl. at Ex. A (FOX042).  The record also shows that MetLife considered Dr. Cohen's
22    opinion, but relied on the fact that Dr. Cohen had not stated that Plaintiff was unable to perform his own
      occupation.  *Id.* at Ex. A (FOX041).  Moreover, in *Siebert*, the district court addressed this precise issue
23    and found that a serious conflict of interest is not created so long as the fiduciary provides sufficient
      justification for disregarding the diagnoses of the treating physicians, and supports the justification with
24    substantial evidence from the record.  *See Siebert*, 220 F. Supp. 2d at 1138-39.  Again, here, it is evident
      that MetLife fully considered Dr. Cohen and Dr. Stern's opinions and notes, had the notes and diagnoses
25    evaluated by two different independent board-qualified psychiatric consultants, and determined that
      Plaintiff was, in fact, suffering from Major Depression, but that Dr. Cohen and Dr. Stern had not
26    provided an opinion that Plaintiff was unable to perform his essential job functions for *any* employer
      in the local economy, which is the definition of disability under the Plan.

27    [7]Plaintiff's citation to *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1011 (9th
28    Cir. 2004), is also unavailing.  In *Hangarter*, the *jury* determined that there was evidence of bias, based
      on the specific testimony and evidence before it.  *Id.*

19

1    by Dr. Becker, who is *not* accused of bias.[8]

2           Plaintiff has also failed to demonstrate that MetLife relied on an improper definition of disability.

3    Plaintiff argues that "MetLife picked up . . . [an] unduly narrow definition of disability from Dr. Becker

4    and changed the definition to whether or not Mr. Fox had adequately documented 'continuous, global

5    psychiatric impairments.'" Pl's Mot. at 5.   However, it is clear from the administrative record that

6    MetLife consistently employed the definition of disability that is set forth in the Plan, which is an

7    inability to "earn more than 80% of your pre-disability earnings at your own occupation for any

8    employer in your local economy."   Dyer Decl. at Ex. B (FOX338).   Importantly, while Dr. Becker did

9    refer to the absence of a "continuous global, psychiatric impairment," he further opined that Plaintiff did

10   not have any impairments that "preclude[d] own occupational functioning in any department for any

11   employer from 2/3/04 forward."   *Id.* at Ex. A (FOX086).   Further, the question that was directed to Dr.

12   Becker by MetLife was, specifically, whether the "medical records support[ed] any period or a

13   continuous period during[] which the employee is unable to perform the duties of his occupation in any

14   department or for any employer?"   *Id.* at Ex. A (FOX093).   Moreover, in the October 7, 2004 letter to

15   Plaintiff, MetLife stated that it was unable to determine "that the medical documentation support[ed]

16   restrictions and limitations of such severity that you would be prevented from performing the materials

17   duties of your occupation for any employer in your Local Economy." *Id.* at Ex. A (FOX127).   Similarly,

18   the December 14, 2004 letter concludes by stating that Plaintiff's claim was being denied due to

19   MetLife's determination that the medical documentation did not support "impairment of such severity

20   that it would prohibit you from performing the material duties of your occupation."   *Id.* at Ex. A

21   (FOX073).

22          Accordingly, Plaintiff has not set forth any material probative evidence showing that a "serious"

23   conflict of interest caused MetLife to breach its fiduciary obligations to him.   As such, the Court

24

25          [8]Additionally, in six of the seven cases that Plaintiff has identified, the decision to deny benefits
     was affirmed by the court and there is no finding that Dr. Kessler's opinion was biased, unsupported,
26   or unreasonable.   In the one case where the decision to deny benefits was reversed, *Brantley v.
     Ameritech Corp.*, 2000 WL 1769548 (E.D. Mich. 2000), the facts are distinguishable.   In *Brantley*, the
27   defendants' decision to deny benefits rested *solely* on the three-paragraph report prepared by Dr. Kessler.
     *Id.* at *7.   Further, unlike the instant case, the Court found in *Brantley* that Dr. Kessler did not make any
28   independent findings with respect to the plaintiff's functional limitations or mental capabilities and did
     not support his report with reference to any medical documentation.   *Id.*

1    concludes that the abuse of discretion standard should be applied.

2    **B.    Analysis of Defendants' Actions under Abuse of Discretion Review**

3          Applying the abuse of discretion standard, Defendants argue that the Court should uphold

4    MetLife's decision to deny Plaintiff LTD benefits because: (1) MetLife's decision was reasonable and

5    is supported by the administrative record; (2) MetLife thoroughly explained to Plaintiff the reasons

6    supporting the denial; (3) MetLife's decision did not conflict with the Plan's plain language; and (4)

7    MetLife's decision was not based on clearly erroneous findings of fact. *See Bendixen*, 185 F.3d at 944

8    (finding that an ERISA plan administrator abuses its discretion when it renders decisions without any

9    explanation, construes provisions of the Plan in a way that conflicts with the plain language of the Plan,

10   or relies on clearly erroneous findings of fact).  Plaintiff does not squarely address Defendants'

11   arguments, but argues instead that MetLife's denial of benefits was unreasonable because Dr. Kessler

12   "attempt[ed] to limit evidence to 'objective' medical evidence." Mot. at 10.[9]

13         The Court notes that Defendants' arguments regarding MetLife's determination are persuasive.

14   As an initial matter, there is no dispute that MetLife properly followed its internal procedures in

15   requesting the relevant medical documentation from Plaintiff.  It is also clear that MetLife reviewed all

16   of the documentation upon receipt.  Further, there is no dispute that Plaintiff and his physicians were

17   promptly notified when MetLife determined that it had not received certain pertinent information and

18   documentation, and that MetLife *voluntarily* agreed to re-evaluate its initial denial of Plaintiff's claim

19   when the supplementary documentation was submitted after the deadline.  Moreover, all of MetLife's

20   correspondence with Plaintiff clearly sets forth the rationale for its decisions in great detail, with

21   references to the specific treatment notes and evaluative reports that MetLife relied upon in reaching

22

23         [9]Plaintiff also argues, at length, that the Court should take judicial notice of the Dictionary and
     Statistical Manual for Mental Disorders, DSM IV TR, published by the American Psychiatric
24   Association, which is attached to the Padway Declaration as Exhibit 1.  Specifically, Plaintiff requests
     judicial notice of the fact that many of the diagnostic measures of depression are subjective, not
25   objective.  This point is irrelevant, however.  As set forth more clearly above, it is not the Court's role
     on the instant motions to substitute its own judgment for all of the evaluating and consulting physicians
26   as to whether Plaintiff is or is not suffering from depression.  Rather, the Court is to determine, at this
     juncture, whether MetLife arbitrarily determined that Plaintiff was not disabled, *as defined by the terms*
27   *of the Plan*.  Further, there is no dispute that the diagnosis of depression is premised on subjective *and*
     objective findings; the record is replete with references to both.  Hence, the Court need not consider
28   Exhibit 1 to resolve the instant Motion and Exhibit 1 has been disregarded.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   its decision.  *See* Dyer Decl. at Ex. A (FOX061, FOX072, FOX127).  MetLife also always clearly

2   informed Plaintiff of the exact Plan provisions on which its decisions were based.  Additionally, as set

3   forth above, there is no evidence that MetLife's decisions conflicted with the plain language of the Plan.

4

5          Further, Defendants have convincingly established that MetLife's denial of benefits was

6   reasonable and was based on substantial evidence, not clearly erroneous findings of fact.  While Plaintiff

7   takes issue with the fact that Dr. Kessler's opinion relied too heavily on the fact that the record was

8   lacking in objective medical evidence of depression, it is quite evident that the lack of objective

9   evidence was but one factor that Dr. Kessler considered in opining that Plaintiff was not disabled, as that

10  term is defined in the Plan.  Further, Dr. Kessler's statement regarding the lack of objective evidence

11  pertains to Dr. Cohen's January 4, 2005 letter *only*.[10]  *See* Dyer Decl. at Ex. A (FOX056) (noting that

12  Dr. Cohen's letter "indicated that 'Mr. Fox has remained quite depressed, and returning him to what he

13  perceives to be a hostile work environment did not seem the best treatment plan[]' but did not provide

14  any rationale, in terms of objective mental status findings or resultant functional limitations, to support

15  a period of disability.").  Moreover, in making its benefits determination, MetLife did not rely solely

16  on Dr. Kessler's opinion, but solicited feedback from Plaintiff's treating physicians on several occasions,

17  as well as the independent consulting report prepared by Dr. Becker.  In fact, the decision to deny

18  benefits was clearly linked to Plaintiff's own physician's reports that Plaintiff was able to return to work

19  in his own occupation with no limitations or restrictions at an alternate work location, despite his

20  depression.  *See, e.g.*, Dyer Decl. at Ex. A (FOX170).  Moreover, as the Ninth Circuit has repeatedly

21  emphasized, the "mere fact that a decision is directly contrary to some evidence in the record does not

22  show that the decision is clearly erroneous."  *Snow v. Standard Ins. Co.*, 87 F.3d 327, 331 (9th Cir.

23  1996).

24          Thus, for all of the above-stated reasons, the Court hereby GRANTS Defendant's Motion and

25  DENIES Plaintiff's Motion.

26                                      **CONCLUSION**

27  _____

28          [10]As such, Plaintiff's argument that MetLife improperly imposed an "objective evidence"
    requirement onto Plan participants is misplaced.

1        IT IS HEREBY ORDERED THAT Defendants' Motion for Summary Judgment [Docket No. 24]

2   is GRANTED and Plaintiff's Motion for Summary Judgment [Docket No. 29] is DENIED.

3        IT IS SO ORDERED.

4

5   Dated: 6/20/06                          SAUNDRA BROWN ARMSTRONG
                                            United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California